Good morning, Justices. May it please the Court. My name is Tom Davis. I represent the plaintiff appellant in this case, William Brown. And in a nutshell, this is a case of a donkey chasing the proverbial carrot on a stick. Mr. Brown was a commissioned salesperson for Sprint. He was hired at a relatively modest base salary, $36,000 a year, with the promise of substantial commissions if he was able to sell telephone services to hotels and large businesses in the Las Vegas area. Las Vegas having so many huge hotels, the commission opportunities were extraordinary there as compared to many other cities. The first year that Mr. Brown was employed, it was mostly a lay-of-the-land type of experience, meeting people, finding out when telephone contracts expired, getting connections so that when there was an opportunity, he could make telephone sales. He made very little more than his base salary. The second year, things started to pay off for him. Contracts ended. He was able to procure the telephone services contract for both Bally's and the Monte Carlo in early 1996. Those were both huge hotels, over 3,000 rooms. And Mr. Brown, as of June of 1996, had maxed out on his commissions. He was making over $10,000 a month in commissions. He was also working on the Circus Circus account, which is even bigger than the other two. Now, the commission structure is such that once you sign a contract and sell, you get a percentage of that revenue over the course of up to 24 months thereafter. So even though you've locked up the contract, your commission isn't paid right then. It gets paid throughout the course of the next few months or up to 24 months, depending upon how it's interpreted. Now, Mr. Brown, when he reached that point in mid-1996, was taken out of the Circus Circus contract. It was transferred to another salesperson. There were only two in the Las Vegas area at that time. And then, about a month later, he was terminated. As a result of his termination, he was not given any of the remaining commissions due on the contracts he had sold. He was not given, obviously, any commission on the Circus Circus contract, which was closed after his termination by the other salesperson. And he was even not paid the remainder of his salary for that month. It took him about five months in letters and phone calls back and forth before he was finally even paid the July compensation he was entitled to. When Sprint eventually refused to pay any of the commission, this lawsuit resulted. And the issue that arose was why was Mr. Brown fired all of a sudden in June and July of 1996? The position of Sprint is he used a sick day inappropriately. That was the reason for the termination. I think if we look at the facts of the case, it shows differently. And Mr. Brown is not the first person, as shown in the record, that this happened to. People, when they have maxed out on commissions, two others in that same area in Las Vegas had the same result. Either transferred to another area, moved up. Somehow, they did not get paid their full round of commissions after they'd gotten the carrot. Mr. Brown chased the carrot, and it was taken from him just as he was about to reap the benefits of his work. In this case, the commissions don't go anywhere else. When Mr. Brown doesn't get paid his commissions over the next either 6 to 18 months, Sprint keeps them. They don't go to another salesperson. They don't go to another manager. So there's the financial benefit to Sprint. There's the relatively minor reason for his termination. And then there's the fact that he's deprived of commissions for work he's already completed. He had nothing more to do on Bally's or Monte Carlo. He could have sat at his desk and been doing nothing. Let me ask you, which provision in which agreement or compensation plan are you relying upon to say that after he was terminated, he was entitled to continue to receive the compensation? The compensation plan itself provides that that's how it's paid out. And it says nothing in that compensation plan about if you're terminated, we take that away from you. In fact, it's Sprint's documents, and if they wanted to say that, they could have made it very clear. There could have been a paragraph, maybe not even in bold print, that said, if you leave for any reason, or if we fire you for any reason, commissions that you've earned even on site. Is there anything in there that says about eligibility to receive the compensation? That's cited by the appellees in their brief. It says, to participate in the plan, you must remain employed by Sprint. Okay, so how do you get around that? I interpret that like a pension plan. It's prospective. As to Circus Circus, I think they can apply that. He didn't close it. It was still in the works. Maybe they fired him for the wrong reason, but that's a separate claim. Well, let's forget about that for just a moment. I just want to know about this claim. You're in a pension plan. I'm using an analogy. Well, this isn't a pension plan. This was a compensation plan. The same type of analogy, though, Your Honor. He cannot earn more commissions and participate in that commission program after he's out of the employee of Sprint. It does not mean that he doesn't get what's already locked in, where his work is completed. That was the promise. Where does it say in either the 95 or 96 compensation plan that it's locked in and that he'll get it even after he leaves? It says neither that nor the inverse. But it does say that to be eligible to participate, you have to remain an employee. We pointed out in our brief how they pulled that from three different sections of the plan, and there's two items on that. One, it's their language, and they could say it clearly. They say it awfully sporadically, and they pull from various areas. And secondly, the record was clear that that document was never even given to Mr. Brown. Everything was given when he signed on for employment. He initialed off, and they put all that in the record. This plan was created after his employment. Let me just clarify one other thing with you. This claim to the continued receipt of money, of compensation that he earned prior to his termination, is not tied to the wrongful discharge claim. It is not, no. I think as a matter of law, he's entitled to those commissions, whether he was wrongfully discharged or not. That's the case law we cited in the brief. Doesn't the plan also provide, though, that you lose eligibility for the continued commission in the event you're discharged? Eligibility for continued commission. And again, read prospectively, he can't continue to let accounts he's worked on that may close. He doesn't get any more commission. The ones that were done and locked in, in my interpretation, and I think in a fair interpretation of the contracts, which they wrote, says that. How can you tell an employee that once you do A, B, and C, we're going to pay you X, Y, and Z, then you do A, B, and C, and they pull X, Y, and Z away from you? It's simply not right. And we cited, very rarely do I get a situation where we have cases throughout the country that say you can't do that. We've cited cases from a number of jurisdictions, and I've seen none the other way. I've seen none, no case that says you can pull back this commission after it's been earned. And in fact, in the appellee's answering brief, they completely ignore that argument. They cite a few Nevada cases and say there's nothing in Nevada specifically that provides a protection for these commissions. But I even set forth a couple of quotes, and I think the Seidler case, which was an Ohio case, said it most clearly. And I've got the quote right here from page three of the decision, where the court says, appellee completed the work for procuring the advertising contracts at issue. Appellants should not be permitted to avoid paying the agreed-upon commissions for the specific contracts procured merely because of their own collection and accounting procedures. Appellants receive a windfall every time they terminate an employee because they do not pay commissions on the contracts previously controlled by that employee until those contracts come up for renewal several months or years later. If we were to accept appellant's argument, we would be endorsing a policy whereby employers could hire employees through promises of commissions and then fire them as soon as possible after the contracts are entered into to avoid paying those commissions. And I can't say it any better than that. That was the promise made to him. Well, there are, you know, one would go on one, I don't, I don't know what motivates Sprint in this type of compensation plan, but you could also say that it's an incentive by being, by characterizing it as an incentive plan, it's also not only to work hard, but to remain with the company. And that would be a good argument and a fair argument if he quit, not if he's terminated and they can't give a reason for a termination that's not subject to question. In this case, again, we were not, that goes to the second two areas of the appeal. We were not allowed to present evidence of motivation for the termination, and the wrongful termination action itself was dismissed on summary judgment. Both of those decisions, I think, were improper because it leads to the ability of the employer to just for any reason take away that promise. If you're going to say, well, the commissions are subject to continued employment and their motivation for him to stay on, and he wants to stay on and you send him away, then you've got to look at why that happened. Is it really because he misused a sick day or is it because they want to avoid paying several hundred thousand dollars in commissions? And these are contracts that Sprint's getting millions of dollars on. I mean, they're getting the revenue in. The payment on the commission was just as the revenue was coming in, just like in the Seidler case. Let me just take you to those other two points. One, you don't claim this was a bad faith termination. You claim it's a wrongful discharge. Well, wrongful discharge in bad faith. You don't claim there's a contract here. You don't contend that he was more than anything other than an at-will employee. His employment was at will. Right. He had a written contract. So then, as I understand Nevada law, you're basically stuck with the claim of a wrongful discharge, you know, in violation of some public policy. Correct, Your Honor. Okay. So what's the public policy here? The public policy is to prevent an employer from making commitments to an employee and then severing that financial commitment, enriching itself financially to the detriment of the employee. And again, I've cited a case in both the Fifth and Sixth Circuits. How about, is there any case in Nevada that says this? Well, I think this is fairly similar to the Kmart case, which is cited by the appellee at length in its brief. Okay. So we look for the public policy in the Kmart case. In Kmart. How about a statute? You got a statute I can look to? I'm not aware of a statute, Your Honor. The Kmart case, though, does provide. It's a retirement benefits case, right? What happened was the employee was fired just before he was about to invest in his retirement plan. The reason for the termination was improperly painting a forklift. And the court found that the real reason was not the painting of the forklift, but was to deprive him of his pension benefits and thereby enrich the employer. This, I think, is very similar. Here we have one where he's locked in monthly commission payments that he's to receive. He's fired for a reason that is questionable, which we weren't allowed to go into in the trial. And as a result of that, the employer keeps hundreds of thousands of dollars in commissions to which the employee would have been entitled. Different types of specific take-backs, but the same type of scenario for the employer. And again, when you go to the fact that it's an at-will employment situation, that is by contract. We have an employment contract here that allows termination at will. There's nothing in there about payment of commissions being at will. So even though he can be fired, they have to honor their commitments to him, at least as to the commissions that he had locked in where he had nothing more to do. And I think that's where the case falls. Mr. Chairman. As you were speaking here, I was reading the purposes of the Hospitality Marketing Group gaining international ñ National Account Manager Incentive Compensation Plan effective January 1995. And it says these compensation, these incentive payments are intended to be an incentive to you to continue with Sprint, not as compensation for specific sales. What does that mean? Well, they certainly were an incentive. He wanted to stay with Sprint and receive his commission. He didn't leave voluntarily. The fact that it says it's not compensation for services is absurd. That's not how it worked. And again, why don't they just say in a specific paragraph or sentence, explain clearly to the employee, if you leave for any reason, no reason, an invalid termination, we have the right to take back all of your commissions. That's stated nowhere. They had control of that document. They never gave it to Mr. Brown, and now they're trying to use it to hoist him on his own petard. He never received this document at all? He never received that plan. They put into evidence everything that was initialed off on by him. That was not part of their package. It was prepared after he was hired and supposedly available for dissemination, but no one was able to show how or if it was disseminated. Mr. Brown testified he never saw it, although the financial aspects of how the commission worked was passed along to him in an e-mail from his supervisor. He got summaries of the two plans, didn't he, a one-page summary of the 95 plan and a three-page summary of the 96 plan? Those he did, but none of the language that we're talking about here was in either of those two summaries. It was basically an explanation of how the commission system worked. Was the 96 plan introduced in evidence? The 96 plan was introduced into evidence. I didn't see it in the excerpt. Is it materially different from the 95 plan? Oh, maybe I'm mistaken. Maybe it was just the 95 plan that was introduced. I think there was testimony that they couldn't locate the 96 plan, but that it was very comparable to the 95 plan. Okay. Turning back from the commission issues to the other two items that I have raised as the appeal issues, and that is, even assuming you give them the benefit of that then you have to go into those other two aspects. You have to go into the fact that evidence should be allowed as to motivation because you can't just let it be done arbitrarily. You have to allow that evidence to show whether there was a breach of the covenant of good faith and fair dealing, even if there wasn't an express breach of contract. Now, don't get me wrong. We feel there was an express breach of contract, but at least you have to go into the motivations behind it. And then lastly, on the wrongful termination, same type of analysis. That was dismissed at the summary judgment stage. We have facts that can give rise to inferences that lead to a potential wrongful termination like in the Kmart-Ponzac case. And those facts are where you have an employee who had earned substantial monies that were going to be paid to him. You have an enrichment of the employer, a motivation for termination. Here you have two other people that ended up losing commissions of the same type around the same time when those things happened. And lastly, you've got a situation where there's a questionable reason for the termination. Those factors give rise to a potential cause of actual wrongful termination. And as a matter of law, that should not have been dismissed. Now, maybe after hearing the facts, the Court could have found that it wasn't proper, but it should not have been summarily adjudicated. Other than additional questions, I'd like to reserve my remaining time for rebuttal. Certainly, Counsel. Thank you. Good morning. Kelly Evans on behalf of Sprint. The question that you started out with with respect to what in the plan actually addresses the issue regarding post-employment compensation. And the plan specifically addresses that when it says that ---- May I stop you there? Yes. Which plan? 1995 plan. There's undisputed testimony that the 96 plan was identical to the 95 plan with respect to the issues that are present today. Were there any differences? The testimony was that there were no differences. Why couldn't you produce the plan? You'll have to ask Sprint that and the record is not clear as to why that was not produced. Well, you find ourselves in a rather odd position, I think, because you're trying to enforce a contract that wasn't provided to the employee nor the court. Your Honor, I would disagree with that assessment of the situation. Well, did the court get the contract? No. Did the employee get the contract? Did the employee get the contract? Yes. There was no evidence that he received the contract. So what's your disagreement? That we're trying to enforce that contract. Judge Proh made specific determinations with respect to this, and there's no evidence of clear error by Judge Proh. Well, except that he said under the express provisions of the 96 contract, and it's not in evidence. I mean, I don't want to quibble with you, but, you know, I've never seen a contract case where they're enforcing express provisions where you say, but we don't have the contract, we lost it. Well, once again, I believe that Judge Proh's determinations were not that he was enforcing a specific provision of the plan, but the opposite, which is the plaintiff who has a burden of establishing a contract and a breach could not establish the existence of a contract that established an entitlement to post-employment compensation.  Because Sprint, its manifestation – Sprint had the contract and didn't provide it to him. Excuse me? Sprint had the contract and he didn't. How could he satisfy – I don't want to quibble with you, but just how could he satisfy his – what you say is his burden when he didn't have the contract? All he had was a summary of the compensation plan. It's a much more basic point than that, Your Honor, and I'm not trying to disagree. No, that's fine. It's an issue of a meeting of the minds. It's simple contract law. He's saying I was entitled to ongoing compensation. We're saying, no, you weren't. We never agreed to that. He testified under my direct. No one ever told me that. He testified no document ever said that. And, in fact, we have a clear manifestation of what Sprint's intent was, with respect to its meeting of the mind, was the 1995 and 1996 compensation plans, which specifically require that an employee be employed on the last day of a measurement month in order to be eligible for incentive compensation. Now, this business about commissions is fundamentally, I believe, a mistake. This is incentive compensation. It's designed to have an employee stay employed and, well, he didn't resign, so it doesn't matter. The problem with that analysis is, what does that mean? An employee goes out and sells to a big hotel like he did, and then he can sit and do nothing? I'm not doing anything. What do we do as an employee and employer at that point? He was an at-will employee, so we have a right to terminate him for any or no reason under clear Nevada law. But Judge Crow's back to the point. Judge Crow's determination specifically, and there's no showing a clear error on any of these points, his determination on page 3 of his order, which is page 185 of the record, the evidence of the two-step trial clearly establishes that Plaintiff Brown's eligibility for incentive compensation was conditioned upon his continued employment with Sprint and that his right to earn or receive, earn or receive, in such compensation terminated with the termination of his employment with Sprint. Now, he keeps talking about he already earned it. Well, he's just reading right out of the plan, and he says, I didn't get the plan. Well, he didn't get the plan. Okay. So the only document we have that arguably is a meeting in the minds is the compensation plan summary, isn't it? Which specifically references and includes the full compensation plan, as did his offer letter, which stated that your compensation, incentive compensation, is subject to the 1995 plan. Now, this is not a benefits case, and it doesn't involve all the principles. Well, let's say the compensation plan is that there is no compensation, that it references the plan and says you're not entitled to anything. Obviously, you couldn't claim that, having represented to him, right? Clearly, that could be a fraudulent representation if we were saying you can get compensation, but then we, on the other hand, are saying that we're not. That's not the case here. It's clearly a case of what was the intent of Sprint. The intent of Sprint was to incentivize employees to go out and sell and remain employed. And the judge prose determinations, and these are all factual determinations with no showing of clear error, was, and once again, referring to Judge Prose's decision on page 4, in sum, the claims made by Plaintiff Brown rely entirely upon oral promises allegedly made to him by Supervisor Elliot Sackler. These promises made by a Sprint employee who had no authority to buy in Sprint are contradicted by the terms of the 95 written agreements signed by Plaintiff Brown. Now, what is that agreement he's talking about there? That is his at-will employment agreement, which he says he admits, yeah, I was an at-will employee. He also acknowledged receipt of a human resources policy that states we can change compensation, we can change wages, we can change benefits at our discretion. So Sprint clearly had the authority to do what it did with respect to this compensation plan. Now, he talks about the plan itself wasn't issued when he was hired. And I think there was evidence at trial to make clear these plans came out several months into the year because you're looking backwards to the previous year and looking at performance and setting quotas, et cetera, et cetera, before you roll out the plans. There was nothing unusual or untoward about the delay in getting the plan put together. Finally, with respect to Judge Proulx's decision, which was not and there's no evidence of clear error, he states, neither was there any contractual agreement. And once again, this isn't Sprint trying to enforce a contract. It's his burden to establish a contract and the violation of it. Neither was there any contractual agreement by Sprint to pay Plaintiff Brown commissions on accounts he secured by Sprint prior to his termination where the revenue generated under those accounts was accrued after his termination. Now, that's exactly what he's complaining about. I secured an account in May and Sprint billed and received revenue after I was terminated. And Judge Proulx specifically finds that there was no contract that required payment under that scenario. And there is no evidence that establishes that that was clear error by Judge Proulx. I mean, his best argument on that is that the plan summary seems to contemplate payment of commissions after their accrual period in subsequent months, and there's nothing that says you aren't entitled to those or that termination extinguishes your right to those commissions. Well, the plan summary is exactly what it says. It's a summary which is designed to communicate how the calculations will be made. Right. The plan summary references and incorporates specifically the actual plan document prevails and disputes between this summary and the plan. Now, Mr. Brown didn't offer any evidence that, gee, I requested the plan document itself and that I was refused that and I never received that because they were somehow hiding the ball from me. They were moving shells. That wasn't what this case is about. He didn't raise the issue until after his termination, and then he wants, well, gee, I want this commission, which is clearly described and talked about as incentive compensation, which he did not meet the second element. One, make cells. Two, remain employed. Right. But you prevented him from fulfilling the second element. There's nothing he could have done. He showed up to work. He was fired. I mean, there was no the second element was done at the election. The reason that we don't have the second element satisfied is that was Sprint's election. Right, which is entirely Sprint's prerogative because this employee acknowledged repeatedly that he was an Atwell employee. If this were a pension plan, would your argument be different? If this were a pension plan? Yes. Do you think that under Nevada law that an employer who has, in an Atwell employment situation, has a right to terminate someone in order to prevent them from investing in pension benefits? Well, that certainly, depending on the nature of the plan, that could raise ERISA issues. It could raise other issues. The Kmart case specifically is not an Atwell employment situation, and that's the problem I have with Mr. Brown's analysis. The Kmart case talks specifically about that this employee had been told, we're going to keep you employed until your retirement. He had been a 10-year employee. There were provisions in the handbook which talked about that you basically had to have four cause to terminate the employee. That's not an Atwell employment relationship. And the Kmart case and the DeAngelo case from the Nevada Supreme Court specifically said that. That's not an employment Atwell context. The reason for my question is I think in other states, this particular set of allegations would clearly state a cause of action for termination of violation of public policy. The allegations, I'm not saying that you're agreeing that they're true, but those allegations certainly state a claim. And there seems to be some question under Nevada law whether it does state a claim. What's your view? Well, I don't believe there is any question about that and that it does not state a claim. And we can look specifically at the Bigelow case, I believe, which talks about and defines exactly what the nature of the public policy wrongful discharge claim is in Nevada. On page 1181, Nevada Supreme Court said, this apparent exception to the Atwell rule is a narrow one. To prevail, the employee must be able to establish that dismissal was based upon the employee's refusing to engage in conduct that was violative of public policy or upon the employee's engaging in conduct which public policy favors. Those are the only two exceptions. You either have to do something that public policy says you should be doing. Well, generally, to cut to the chase, other states have held that trying to terminate someone in order to either defeat their eligibility for pension, compensation, commissions would fall within that public policy rubric. What can you tell me about Nevada law in that respect? I missed the question because of the cough, I'm sorry. In other states, other states have held that trying to terminate someone allegedly to defeat their eligibility for compensation or retirement benefits would constitute a violation of public policy, an actual one. What can you tell me about the state of Nevada law with respect to that? Well, as I just said, Nevada has never addressed and recognized that, and to the contrary has said that the exception for public policy is a very narrow one, and you have to establish one of those two elements I just talked about. Right, but the other, using that same analysis, other states have said that it satisfies a second element. I gather what your argument is, is that Nevada hasn't addressed it and Nevada has applied that exception even more narrowly in other states? Absolutely. And if you look at the cases that Mr. Brown in his briefs cited, they're talking about cases, for example, from Massachusetts, which specifically say if you have any kind of commission employee, we're going to require there be a showing of cause to terminate. That's way far beyond what anything in Nevada has ever said, and it doesn't fit within the analysis that Nevada has had, which is very limited here with respect to it. Now, what is the public policy that Mr. Brown is trying to enforce here? He didn't identify a public policy at all at the summary judgment stage. To the contrary, what he argued at the summary judgment stage was we had a disagreement. Mr. Sackler and I didn't get along. He didn't like me. He was out to get me because he thought that I was going to try to get his job. Well, in Nevada, there's a case, the Alum case, which says specifically that mixed motive you don't even get into in a public policy wrongful discharge case. So that Mr. Brown acknowledges that there was a legitimate reason, which has nothing to do with any kind of public policy, which was Mr. Sackler didn't like me because he thought I was out to get his job. Well, if you have no mixed motive, he's admitting that he doesn't have a public policy wrongful discharge case. Moreover, at the summary judgment stage, where's the evidence in the record that there was a public policy that was being violated by Sprint? There's no allegation. There's no evidence presented to Judge Rawlinson that this was a public policy. Where's the statute? Where's the regulation? Where's the case law that talks about that and, once again, focused on him being instructed to do something that's unlawful or him doing something that's unlawful, and then we didn't allow him to do that? That's no evidence of that at the summary judgment stage. Now, what he wants to do is, at the trial, well, we want to bring all of this stuff in because it somehow is going to relate to some bad faith claim. Well, he's an at-will employee. He doesn't have a bad faith claim, as the D'Angelo case says. You're at-will. You've got one claim, one exception to the at-will employment. It's public policy, and he doesn't have that. With respect to the third issue that's been raised on appeal, which is this evidentiary issue, there's been no showing that the exclusion of this evidence that they tried to offer somehow had an impact on any of the decisions that Judge Crowe reached. The fraud claim dealt with being a representation about the quota, and was it 8,000 or was it 10,000, or the run rate? Was it a 12-month calendar or was it a 12-month run? Well, whatever the reason for termination doesn't have anything to do with those fraud claims or any other claim. And so in addition to showing that an abuse of discretion was made by Judge Crowe, there needs to be a showing that that abuse actually resulted in the wrong decision with respect to any of the claims that were being tried, and there simply has been no showing of that. Finally, going back to the starting point here, with respect to this individual being an at-will employee, he acknowledged, Mr. Brown acknowledged, receipt of Sprint's human resources policy. And in that it says, Sprint reserves the right to establish and change an employee's hours, benefit, wages, and working conditions, and to discipline and discharge any employee without cause and without notice. He also signed, and this is the record BRO-165, he also signed a specific at-will employment acknowledgement, stating, I understand and acknowledge that there is no agreement between me and Sprint or any of its affiliated companies for any definitive period of employment, and that Sprint has the right to terminate my employment at any time with or without cause. I understand that this constitutes the entire and final agreement between me and Sprint regarding the period of my employment and the termination of my employment, that any prior agreements or understandings, oral or written, are superseded by the terms of this agreement, and this agreement may not be altered, amended, modified, or otherwise changed except by a written document which is signed by the president of the company. Now, Mr. Brown wants to come in and say, hold on, my at-will employment has somehow been modified by this incentive compensation plan, and that you have to read back into it some cause to allow Sprint to terminate me. But he acknowledged when he started employment with us that he was an at-will employee and that no subsequent agreement, no subsequent document, no subsequent statement, nothing like that was going to change his at-will employment status. He hasn't established that. There's been no showing that there was ever an agreement that we were going to have cause or have to exercise some discretion other than the most broad discretion available under Nevada law, which is that he was an at-will employee, could be terminated for any reason. Thank you. Roberts. Thank you, counsel. Addressing a couple of the points that were just raised, we don't have a dispute with the at-will aspect of the termination. He can be terminated for any reason other than an improper reason, and that's where the wrongful termination comes in. Secondarily, though, it's at will to terminate, not at will to confiscate monies that have already been earned by the employee. And they did change terms and conditions of his employment. I think Sprint realized that with the large hotels in Las Vegas, a couple of big contracts could really set this commission structure higher. They raised the level during his employment from $8,000 a month in sales to $10,000 a month. These were things we objected to during the course of the district court trial. These were factual decisions made by the district court, and those are not issues on appeal. What we're looking at are the legal issues that we claim are not properly decided as a matter of law, not on the basis of the facts. The first one, the other item they point to before I go on is that they say we never asked for documents or got any additional documents changing any of these plan provisions. Again, I would ask you to look at some of the case law because there are very clear statements in there to the effect of this, if you're going to try and do something like this, this language has to be crystal clear. We're not going to interpret an employment contract such as to work a forfeiture. Mr. Brown got his commission plan. Yeah, they didn't say, oh, by the way, you know that if you leave, you don't get paid those extra 10 months of commission that you've earned after the fact. But similarly, they didn't talk about whether that gets taken away either. It's Sprint's duty. If they want to make that provision, put it in the plan. Don't have a couple of excerpts pulled out and say what this really means is we can take this away after you leave, even as to the closed contracts. We're not raising issues about Circus Circus and other ones. He could have earned a lot more. He had no salary for a while after he was fired when he was unemployed. All we're saying is give him what he had already in the hopper he was entitled to be paid on. In the way the contract was administered, I gather he got a, did he get a monthly check for the commissions? He did. He did. Got monthly checks. And, again, I have seen not one case, and I've done a lot of research on this. I'm sure Sprint has also, that says you can take back these once they've, once the employee has done everything he has to do to earn this commission. The payment was only a matter of giving it to him as it came in from the customer. It was a collection process and a pass-through. It wasn't a situation where he had to, you know, go in every month and change some circuitry or do things. His goal was done. He was the salesperson, not the technician. So there's nothing more for him to do. What we're asking this Court to do is to find, not on the basis of the factual findings, because, again, we're not challenging any of the factual findings, even though we disagreed with some of them. We're asking this Court to find that as a matter of law, he's entitled to be paid those undisputed commissions. He should have a judgment in his favor of that amount that's set forth in its, the record 00113 shows the Sprint calculations. It's $112,400. That's what he would have earned had he not made another sale or done another thing at Sprint, just staying there as an employee. Secondly, we're asking that the case be remanded to the district court to allow testimony as to the wrongful termination claim and the motive for the termination for the violation of the covenant of good faith and fair dealing under this contract. In that case, Mr. Brown may be entitled to additional damages. Those would include his period of unemployment. If, in fact, they've deprived him of commissions he would have earned but for being fired, he might have claim for other commissions. And the five-month period of time where he was fighting back and forth with Sprint just to get his July money paid, the money that he was clearly entitled to that didn't come in until five or six months down the road. This is literally the case where Mr. Brown, a carrot was held out in front of him. You go get that carrot and you're going to make a lot of money, young man. He went out and he got the carrot, and we're asking this Court not to allow the employer to take that carrot away from him after the fact. Thank you. Thank you. Thank you, counsel. The case just heard will be submitted. Let's go to the next case on the oral argument calendar, which is Montreaux v. Sierra Pines Resorts.
judges: Thomas, Paez, Burns